[No. S122590. May 18, 2006.]

In re FRED HARLAN FREEMAN on Habeas Corpus.

**COUNSEL**

Michael Laurence, Gary D. Sowards, Shelley J. Sandusky, Shani Pines and Bethany L. O'Neill for Petitioner Fred Harlan Freeman.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Dane R. Gillette, Assistant Attorneys General,

Bruce Ortega, Morris Lenk, Seth K. Schalit, Ronald S. Matthias and Geoffrey S. Lauter, Deputy Attorneys General, for Respondent State of California.

## Opinion

**BAXTER, J.**—Petitioner Fred Harlan Freeman was sentenced to death for the January 1984 murder with special circumstances of Donald Koger. We affirmed the judgment on direct appeal. (*People v. Freeman* (1994) 8 Cal.4th 450 [34 Cal.Rptr.2d 558, 882 P.2d 249].)

On February 10, 2004, Freeman filed a third petition for writ of habeas corpus presenting four claims. Each claim relied at least in part on the allegation that the Honorable Stanley P. Golde of the Alameda County Superior Court, who presided over Freeman's trial, had an ex parte conversation with the prosecutor during which he directed the prosecutor to excuse Jewish prospective jurors from the jury, and that the prosecutor followed Judge Golde's advice in exercising his peremptory challenges. We issued an order to show cause why relief should not be granted on the grounds that the trial judge actively colluded with the prosecutor to secure a conviction and death sentence and that the prosecutor improperly exercised peremptory challenges on the basis of religion at the advice of the trial judge. After receiving respondent's return, we directed the Presiding Judge of the Santa Clara County Superior Court to select a judge to serve as a referee at an evidentiary hearing. The presiding judge selected the Honorable Kevin Murphy, and we appointed him as our referee to take evidence and make findings of fact on specified allegations.

On April 5, 2005, the referee issued his report. He found that Judge Golde did not direct the prosecutor during an ex parte conversation to excuse prospective jurors who were Jewish and that the prosecutor did not in fact excuse any prospective juror who was Jewish or who the prosecutor believed to be Jewish. After carefully considering the record and the briefing in this court, we likewise conclude that Freeman has failed to prove the allegations in the petition. The order to show cause is discharged.

### Background

#### A. *The Underlying Judgment*

The facts underlying Freeman's convictions are not pertinent to the issues encompassed in the order to show cause. It suffices to note that a jury convicted Freeman of the first degree murder of Donald Koger with the special circumstance of robbery murder, five counts of robbery, and three

counts of attempted robbery, all with the personal use of a firearm. Freeman and two others, one a codefendant at trial, robbed the patrons of a neighborhood bar in Berkeley. Freeman shot Koger in the left side of the head, killing him. After the other two robbers fled, Freeman stayed behind and took property from the patrons one by one. Three eyewitnesses identified Freeman as the gunman who killed Koger, and another identified him tentatively. Carmen Maria Horton, who was Freeman's friend and the codefendant's girlfriend, testified that she was with both Freeman and the codefendant shortly after the crime. Freeman told her that they had gone to the bar to "rob" it, and that he had shot the victim. He showed her the gun he used, which she later sold. (See *People v. Freeman, supra,* 8 Cal.4th at pp. 469–471.)

## B. *The Habeas Corpus Proceedings*

The third petition for writ of habeas corpus alleged, among other things, that Judge Golde "directed and encouraged [the prosecutor] to exclude Jewish prospective jurors, and that the prosecutor both acknowledged and followed the trial judge's advice." The petition also alleged that the prosecutor and the Alameda County District Attorney's Office had a "standard practice" of excluding Jews and African-American women from capital juries.

The allegations were based on the declaration of the trial prosecutor, former Alameda County Deputy District Attorney John R. Quatman, dated May 29, 2003. Paragraph 10 of that declaration states in relevant part: "One time . . . Judge Golde called me into chambers and asked rhetorically 'Quatman, what are you doing?' When I asked what the problem was, he said I had not challenged a prospective juror who was Jewish. . . . He said I could not have a Jew on the jury, and asked me if I was aware that when Adolph Eichman[n] was apprehended after World War II there was a major controversy in Israel over whether he should be executed. Judge Golde said no Jew would vote to send a defendant to the gas chamber. I thanked Judge Golde for his advice, and thereafter excused any prospective juror who was Jewish. Actually, Judge Golde was only telling me what I already should have known to do. It was standard practice to exclude Jewish jurors in death cases; as it was to exclude African-American women from capital juries."

On July 28, 2004, we issued an order to show cause why relief should not be granted on the ground that "(1) the trial judge actively colluded with the prosecutor to secure a conviction and death sentence, and (2) the prosecutor improperly exercised peremptory challenges on the basis of religion at the advice of the trial judge." In the return, the People, represented by the Attorney General, denied the relevant allegations and asked that a referee be appointed to resolve the conflict. We thereafter appointed a referee to hear evidence and make findings of fact on these questions:

"1. Did Judge Stanley Golde commit the acts alleged in paragraph 10 of the declaration of John R. Quatman . . . ? If so, exactly what did he do, and where, when, and under what circumstances did he do it?

"2. Did John R. Quatman exercise any peremptory challenges at trial against any prospective juror who either was Jewish or who[] he believed was Jewish? If so, whom did he challenge, and why did he challenge that person? Did John R. Quatman exercise any peremptory challenges on the basis of religion on the advice of Judge Golde?"

The referee heard testimony from nearly two dozen witnesses over five days, including former Deputy District Attorney Quatman. The referee also considered numerous documentary exhibits. Judge Golde, however, had died several years before Quatman made these allegations and thus was not available to testify. Following the hearing, the referee found that Quatman's testimony was unworthy of belief and answered the critical questions in the negative.

The parties have filed postreference briefs on the merits. Freeman has also filed exceptions to the referee's report and a motion to take additional evidence. We address the referee's individual findings and Freeman's specific exceptions to them only insofar as they are relevant to the two questions before us: (1) Did Judge Golde advise Quatman to exercise peremptory challenges against Jewish prospective jurors in Freeman's trial?, and (2) Did Quatman exercise peremptory challenges at trial based on the juror's actual or perceived religion?

### DISCUSSION

Freeman in essence advances two legal claims. First, he argues that Judge Golde colluded with the prosecutor, John R. Quatman, to secure a conviction and death sentence by calling Quatman into chambers for an ex parte conference in which he advised Quatman to exclude a Jewish prospective juror. He contends that the judge's advocacy denied him his right to be tried before a neutral, disinterested tribunal (*In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 75 S.Ct. 623]) and violated an assortment of state and federal constitutional rights. Second, Freeman argues that Quatman deliberately and unconstitutionally used peremptory challenges to exclude Jewish prospective jurors in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*), and numerous state and federal constitutional provisions.

As previously indicated, the referee, after hearing evidence, found no factual basis for these claims. He determined that the alleged ex parte

conversation did not occur and that Quatman did not exercise his peremptory challenges on an impermissible basis.

In evaluating Freeman's allegations, this court gives great weight to those of the referee's findings that are supported by substantial evidence. (*In re Cox* (2003) 30 Cal.4th 974, 998 [135 Cal.Rptr.2d 315, 70 P.3d 313]; *In re Johnson* (1998) 18 Cal.4th 447, 461 [75 Cal.Rptr.2d 878, 957 P.2d 299]; *In re Ross* (1995) 10 Cal.4th 184, 201 [40 Cal.Rptr.2d 544, 892 P.2d 1287].) "This is especially true for findings involving credibility determinations. The central reason for referring a habeas corpus claim for an evidentiary hearing is to obtain credibility determinations (*In re Scott* (2003) 29 Cal.4th 783, 824 [129 Cal.Rptr.2d 605, 61 P.3d 402]); consequently, we give special deference to the referee on factual questions 'requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying' (*In re Malone* (1996) 12 Cal.4th 935, 946 [50 Cal.Rptr.2d 281, 911 P.2d 468])." (*In re Thomas* (2006) 37 Cal.4th 1249, 1256 [39 Cal.Rptr.3d 845, 129 P.3d 49].) With that standard in mind, we proceed to consider Freeman's allegations.

A. *Whether Judge Golde Initiated an Ex Parte Conversation With the Prosecutor and Advised Him to Exclude a Jewish Prospective Juror*

In late 1986, Quatman, then an Alameda County Deputy District Attorney, was assigned to prosecute Freeman before Judge Golde. This was Quatman's first capital prosecution but not the first time he had appeared in front of Judge Golde. In addition to their professional relationship, Quatman and his wife were both "close" to Judge Golde, who had been a guest at their wedding. Freeman's attorney, Spencer Strellis, also had a preexisting relationship with Judge Golde; the two had practiced law together before Golde was appointed to the bench.

The sequestered *Hovey* voir dire,[1] which in this case encompassed questions concerning the jurors' views of the death penalty as well as general questions, began on February 3, 1987, and lasted until April 23, 1987. Those prospective jurors who were not excused for cause were directed to return on April 29, 1987, for what local attorneys called the "big spin." In the big spin, the names of all of the remaining prospective jurors were placed into a tumbler, and 12 names were pulled out to be seated in the jury box. At that point, and without any further questioning, the parties would proceed to exercise their peremptory challenges, with the defense allowed to go first.

---

[1] The trial in the present case preceded the passage of Proposition 115 in 1990, and therefore was governed by *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301] (*Hovey*).

Quatman testified that on April 28, 1987, the day before the big spin, Judge Golde held an off-the-record conference with the attorneys in which he offered them each five "extra challenges" or "freebie[s]" to be used at that time to excuse jurors they did not want. Strellis exercised that option; Quatman did not.[2] It was after this off-the-record conference and a brief hearing in the courtroom that, according to Quatman, the ex parte conversation occurred. Although Quatman retired from the Alameda County District Attorney's Office in 1998, he never told anyone about the ex parte conversation until March 2003, when a staff attorney with the California Appellate Project visited him and his wife in Montana to discuss a case his wife had been assigned. Quatman executed a declaration describing the conversation in May 2003.

At the reference hearing, Quatman testified that as he and defense counsel were leaving the courtroom, Judge Golde said "Jack" and crooked his finger so as to indicate that Quatman should come into chambers. Judge Golde asked, "What are you doing?"—apparently referring to Quatman's failure to challenge any jurors prior to the big spin. Quatman replied, "What do you mean what am I doing?" Judge Golde then reportedly scolded, "You didn't challenge the Jew." "And I said, 'What are you talking about?' And he said, 'No Jewish person could sit on a death penalty jury and return a verdict.' And I said, 'Why?' And he told me about [Adolf Eichmann] and the problems in Israel when they finally caught him and what to do with him. . . . And I thanked him for his advice and I left chambers." Quatman testified that he subsequently exercised peremptory challenges at the big spin against three jurors—Juror Mishell, Juror Peisker, and Juror LaPut—because he believed they were Jewish.

However, neither Freeman nor Quatman offered any evidence that these jurors were actually Jewish.[3] To corroborate Quatman's testimony, Freeman instead offered notes that Quatman had taken during voir dire and in preparation for the big spin. Quatman testified that he had taken notes during voir dire and had rated the prospective jurors on a scale of zero to 10. A zero rating was a "must kick," i.e., a juror Quatman was determined to excuse if he had enough challenges; a 10 rating was a "must keep," i.e., a juror

---

[2] Strellis characterized the offer as one to "revisit" prior challenges for cause. The referee made a factual finding that Judge Golde had granted a similar opportunity to revisit for-cause challenges prior to the big spin in a different capital case, *People v. Day* (Super.Ct. Alameda County, 1987, No. 76328), based on testimony from Professor Stephen Thaman, who was then an Alameda County Public Defender, and from Justice Carol Corrigan, who was then an Alameda County Deputy District Attorney. We accept the referee's express finding that the parties had such a conference in the *Day* case and the referee's implied finding that a conference of a similar nature occurred in this case.

[3] Indeed, at the evidentiary hearing, the parties stipulated that Juror Mishell was *not* Jewish, but her husband was. The parties further stipulated that Mishell was a "Jewish name."

Quatman wanted to keep on the panel. Ideally, Quatman wanted to keep only jurors who rated a six or higher. Quatman testified that he subsequently distilled the information from his voir dire notes onto Rolodex cards, which were the only notes he used during the big spin. These Rolodex cards, too, carried his zero-to-10 rating of the prospective jurors. Quatman claims that, following his ex parte conversation with Judge Golde, he reduced the ratings for two prospective jurors, Juror Peisker and Juror LaPut. Quatman testified that he initially rated these prospective jurors four and three, respectively, but reduced their ratings to zero when he prepared his Rolodex cards because he believed they were Jewish. Quatman also testified that he had rated Juror Mishell a zero even before his alleged conversation with Judge Golde.

The referee determined that Quatman's claim that Judge Golde advised him to exclude Jewish prospective jurors during an ex parte conversation was not credible and determined that the conversation did not occur. We accept the referee's determination for several reasons.

First, Freeman fails to persuade us that Judge Golde would have chastised Quatman for failing to challenge a Jewish prospective juror before the big spin—i.e., before the parties had had any opportunity to exercise their peremptory challenges. Assuming, as Freeman does, that Juror Mishell must have been "the prospective juror Judge Golde had in mind when he cautioned Mr. Quatman that he had failed to take the opportunity to remove a Jewish prospective juror during the unreported chambers proceedings on April 28, 1987," it remains to be explained *why* Judge Golde would have perceived a need to commit misconduct by advising Quatman how to pick a jury at this very early stage. If, as the referee found occurred in the *Day* case and as Defense Attorney Strellis testified occurred here, Judge Golde gave the parties an opportunity to *revisit* earlier for-cause challenges in the unreported conference, then Quatman's failure to challenge Juror Mishell would not have alarmed Judge Golde, inasmuch as Quatman had not earlier asserted a for-cause challenge to Juror Mishell. Even if, as Quatman claimed, the unreported conference was an opportunity for the parties to exercise five challenges as they wished just prior to the big spin, Quatman's failure to challenge Juror Mishell at that point would not likely have caused Judge Golde any concern, either. Quatman had already elicited from Juror Mishell that she was unsure the death penalty should exist, that she did not believe it was fairly applied, and that she would have difficulty voting for the death penalty for crimes other than those of the type committed by Charles Manson. Judge Golde had further indication of Quatman's state of mind when he corrected Quatman during voir dire for saying that Juror Mishell "might" be able to vote for the death penalty if she believed it was appropriate for a murder during the course of a robbery: "She didn't say 'might,' she said she thinks she could. You're not going to get an affidavit in blood." And, if that were not clear enough, Quatman stated to the juror

baldly, "You see, my feeling is that you're being reserved or there's some reservations about it that you're not being totally honest about." When the juror admitted, "I don't feel comfortable about it," Judge Golde interjected, "You don't have to explain" and turned the questioning over to defense counsel. No one would be surprised, least of all an experienced jurist like Judge Golde, that Quatman had rated the juror a zero—meaning "must kick"—based simply on her voir dire.

Moreover, as Quatman testified, he did not always raise what he considered to be meritorious challenges for cause before Judge Golde in this case because he had been given so many peremptory challenges.[4] "So I felt in the *Freeman* case that I had things fairly well under control." Freeman offers no reason why Judge Golde would have viewed the situation any differently.

Second, there were material inconsistencies between the ex parte conversation Quatman described to Attorney Daniel Horowitz shortly after the allegations were made public and the ex parte conversation Quatman described at the reference hearing. At the reference hearing, Quatman testified that Judge Golde called him into chambers after the parties had finished an off-the-record conference. Yet, in a telephone conversation with Horowitz in the summer of 2004, Quatman "didn't frame it . . . in terms of a summons." As Horowitz explained it, being summoned is different from "just kind of 'kicking it' with the judge and just talking about cases in general terms." Moreover, the description Quatman provided at the reference hearing was that Judge Golde, in his formal role as a judge, had complained that Quatman did not excuse a Jewish prospective juror and was essentially advising him to do so. Yet the version described in the conversation with Horowitz was quite different: "The way he related it was that, we were just—'Dan, we were just sitting around in chambers and bullshitting like we always do.'. . . [H]e framed it in the sense, he was sort of drawing on my knowledge of how things work, which is, that you sit around in chambers and just shoot the breeze with the judges in a social manner. . . . He just described the conversation where they were just essentially 'bullshitting' back and forth, to use his words, and there never was in his relation of this incident to me, any concept of the judge instructing him to take any action one way or another. . . . [N]ever in there was there any intimation or statement that Stanley Golde told him to do something or that he did anything in response to what Stanley Golde told him to do." Indeed, although Horowitz had heard that Quatman claimed "Stanley Golde told him to knock the Jews off the jury," Quatman cautioned Horowitz that "it's not as strong as the way the papers got it." A few months later, after reviewing Quatman's declaration, Horowitz believed the declaration differed from what Quatman had said to him a few

---

[4] The defense was given 26 joint peremptory challenges, plus five separate challenges for each of the defendants, Freeman and Gutierrez. Quatman was given 36 peremptory challenges.

months earlier and called Quatman to tell him so. Quatman responded, "Dan, Golde told me to challenge the Jewish people and I did." Horowitz replied, "Well, that's not what I remember you saying."

These inconsistencies support the referee's finding, which we accept, that Freeman failed to establish, by a preponderance of the evidence, that the ex parte conversation Quatman described in his declaration and at the reference hearing actually occurred. Unlike Freeman, we do not believe the referee's assessment of Horowitz's credibility was fatally undermined by the fact that Horowitz did not take notes during his conversation with Quatman, that Horowitz could not recall who first alerted him to the allegations Quatman had made about the *Freeman* case, or that Horowitz was concerned the allegations reported in the press "might hurt" Judge Golde's family. Nor do we conclude, as Freeman does, that the referee's restriction on counsel's attempt to ask Horowitz how long he had been testifying on direct examination or that the referee's failure to observe Horowitz's gaze during his recollection of a portion of his conversation with Quatman establishes that "[t]he referee's purported 'credibility' determination . . . reflects nothing more than his result-oriented reliance on selective note-taking to find, in direct contradiction of the record, that Mr. Quatman made 'inconsistent statements.' "

Third, Quatman's character for honesty and integrity was poor. Colton Carmine, an Alameda County Deputy District Attorney who had known Quatman since 1976 and had worked with him for 20 years, testified that Quatman exaggerated a lot and was not ethical. He also cautioned that "[i]f it didn't serve his purpose, he wouldn't tell the truth." Julie Dunger, another Alameda County Deputy District Attorney, testified that Quatman is dishonest and that he exaggerates. Michael Roman, a criminal defense attorney who had known Quatman for over 25 years, testified that Quatman was not an honest or credible person and that his reputation for honesty and veracity was very poor. And Judge Robert Hurley, who had worked previously in the district attorney's office with Quatman, testified that Quatman "wanted to win more than he should" and "was willing to bend or break rules to win more than any prosecutor should."

The report from attorneys in Montana, where Quatman had moved in 1998, was scarcely better. Dean Chisholm, who had participated in a dozen cases with Quatman, testified that he was untrustworthy and that he had a reputation for untrustworthiness. Sean Frampton, who had opposed Quatman in 10 to 20 cases, likewise testified that Quatman was untrustworthy and had a reputation for untrustworthiness. Two lawyers, however, had a contrary view. David Stufft testified that Quatman had a good reputation for honesty and truthfulness in the Montana community—although Stufft himself did seek

sanctions against Quatman in a criminal case and ask that he be held in contempt. Judge Bradley Johnson, the City Judge of Whitefish, Montana, testified that Quatman, who appears fairly frequently in his courtroom, is honest and truthful and has a good reputation for those traits.

Although there was a conflict in the evidence as to Quatman's character for honesty and integrity among the Montana witnesses, there was no such conflict among the Alameda County witnesses who had known Quatman for 20 years or more. The referee also had the benefit of observing Quatman and these witnesses testify. Despite Freeman's protestations, we agree with the referee that these witnesses offered adequate foundation for their opinions of Quatman's honesty and his reputation for honesty. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1312 [283 Cal.Rptr. 382, 812 P.2d 563] [reputation testimony is admissible even though based on hearsay]; *People v. Eli* (1967) 66 Cal.2d 63, 78 [56 Cal.Rptr. 916, 424 P.2d 356].) There was thus more than substantial evidence to support the referee's finding that Quatman's character and reputation for honesty and integrity were poor. We accept the referee's finding.[5]

---

[5] Freeman objects that the referee's finding that "the character of John Quatman is such that he can't be believed" relied in part on testimony concerning specific instances of Quatman's dishonesty and that such reliance violated Evidence Code section 787, which deems inadmissible evidence of specific instances of a witness's conduct (other than a felony conviction) to attack or support the credibility of a witness, and Evidence Code section 1101, subdivision (a), which deems inadmissible evidence of a person's character in the form of opinion, reputation, or specific instances of conduct when offered to prove his or her conduct on a specified occasion. Neither objection is well taken. As we have previously explained, the enactment of article I, section 28, subdivision (d) of the California Constitution "supersedes all California restrictions on the admission of relevant evidence except those preserved or permitted by the express words of section 28(d) itself." (*People v. Wheeler* (1992) 4 Cal.4th 284, 291 [14 Cal.Rptr.2d 418, 841 P.2d 938].) Among those provisions superseded is Evidence Code section 787. (*People v. Wheeler, supra*, 4 Cal.4th at pp. 291–292.) The referee did not err under Evidence Code section 1101, either, inasmuch as subdivision (c) of that provision states explicitly that "[n]othing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Accordingly, the referee did not err in considering testimony that Quatman explained to Deputy District Attorney Dunger how he made sure an eyewitness would identify a defendant in court by keeping a picture of the defendant on his desk where the witness would be sure to see it; that Quatman advised Dunger to instruct witnesses who testify under a plea bargain "exactly" what to say, implying that "you bought him, you made a deal, you own him"; and that Quatman told Judge Hurley, who was then in the district attorney's office, he would have "round-filed" recently discovered exculpatory evidence rather than turn it over to the defense. Deputy District Attorney Carmine's testimony that Quatman demonstrated how to persuade reluctant witnesses to cooperate by showing them how easy it would be to "frame" them for possession of drugs, however, was introduced solely to provide a foundation for Carmine's opinion that Quatman was dishonest and unethical. The referee thus erred in considering this incident for its truth, but the error did not affect the referee's determination that Quatman was unworthy of belief nor our acceptance of that finding based on an independent review of the record.

Fourth, Quatman had a motive to undermine a capital conviction secured by the Alameda County District Attorney's Office because of his animosity toward the office in general and District Attorney Tom Orloff in particular. As Quatman conceded, it was common knowledge that he and Orloff had an unfriendly relationship dating from "way back" when they were young deputies.

In 1993, when Quatman was a trial team supervisor, a female subordinate accused him of making disparaging remarks to her. After Orloff investigated the accusation, Quatman was disciplined by Orloff and Jack Meehan, who was then the district attorney, and was transferred to the consumer and environmental protection unit, where he finished his career in the office. He never again tried a capital case, which was his favorite category of cases, or even a felony-murder case and was never again a team leader. Quatman admitted he was upset over these events and that he shared his feelings with others. Quatman told Julie Dunger, Laurinda Ochoa, and Robert Chambers, who also worked in the consumer and environmental protection unit, that the transfer was a demotion and that it was unjust. Chambers testified that Quatman held Orloff responsible for his predicament. Dunger and Ochoa testified that Quatman's anger at the office and at Orloff was a "constant theme." Dunger added that Quatman was "very bitter" and "extremely adamant" about his feelings. Paul Sequiera, an assistant district attorney in Contra Costa County who socialized with Quatman in the 1990's, needed to do no more than ask Quatman "how's it going?" to hear that Quatman "always felt like he was being screwed by the office" and was "venomous" toward Orloff in particular. It was very clear to Sequiera that Quatman hated Orloff and blamed him for some of his problems in the office.

In the mid-1990's, when Quatman was running for a judgeship, he discovered the news media were attempting to obtain his personnel file. Quatman asked Orloff to "purge" or "shred" the document relating to the discipline he had suffered in 1993, but Orloff refused, pointing out that "it wasn't the right thing to do" and that a coverup would be worse than the underlying disciplinary problem. Quatman "vehemently" disagreed with Orloff's refusal to purge or shred the document. Ultimately, the office resisted disclosure of the file. Quatman suspected that the administration had nonetheless leaked the materials to the press and shared his anger with his fellow deputies. Orloff did not endorse Quatman in his unsuccessful race for a judgeship.

Unfortunately, Quatman's bitterness did not mellow over the years. Daniel Wilson, who practiced in a partnership with Quatman and his wife in Montana for a year, had heard Quatman claim that he had been exiled to the consumer fraud unit by an "enemy" in retaliation for prior dealings. Quatman

also claimed, falsely, that he had returned to the capital prosecution team after the transfer "because, in his absence, the death penalty prosecution team in the office couldn't win a death penalty conviction and it was necessary to bring him back." Then, at a retirement party for a colleague at the Alameda County District Attorney's Office in May 2003—the same month that Quatman executed a declaration recounting the alleged ex parte conversation—Quatman continued to express anger at the office and talked to various people "saying such horrible things about the office and he seemed happy about it. He seemed excited about it. . . . He was—he was lit up."

The foregoing evidence refuted Quatman's assertion at the reference hearing that he did not carry any bitterness toward the office or Orloff. Nor does the evidence that Quatman maintained close relationships with individual people in the office affect the self-evident conclusion that Quatman harbored animosity toward the office *as an institution* or to Orloff in particular—a conclusion that would remain unaffected even if the referee had admitted evidence that Quatman, for his 25 years of service to the office, received a plaque of appreciation from the consumer fraud unit at his retirement luncheon. It is true that the initial target of Quatman's accusation would appear to be Judge Golde, but, inasmuch as Judge Golde was already dead at the time Quatman first disclosed this ex parte conversation, it is the Alameda County District Attorney's Office that has suffered the fallout from Quatman's claims. In sum, we agree with the referee that Quatman had a motive to tell a story that predictably caused trouble and embarrassment for the office, even if his decision to do so was opportunistic and not especially well planned out and even if Quatman arguably could have chosen to embarrass the office in other, more direct ways.[6]

Fifth, we disagree with Freeman's claim that Quatman's juror notes corroborate his account of the ex parte conversation with Judge Golde. Neither the notes taken during voir dire nor the Rolodex cards prepared for the big spin indicates that Jurors Mishell, Peisker, and LaPut were Jewish or that Quatman believed they were. Although Quatman sought to justify this omission at the reference hearing by claiming he did not write down prospective jurors' religion unless they had mentioned it themselves, that explanation is difficult to credit, given Quatman's "habit and custom to note every bit of information [he] could to make a more reasonable determination on whether they were [pro-]death or not." Indeed, Quatman's voir dire notes and Rolodex cards routinely included remarks concerning the jurors' physical

---

[6] We also disagree with Freeman that the referee erred in excluding or ignoring evidence that other lawyers in the office may have sympathized with Quatman's frustrations or shared his criticisms of the office or of Orloff. The issue here is not whether *other* attorneys might have had a grudge against the district attorney's office but whether Quatman did. We also reject Freeman's baroque claim that the referee's failure to ascertain the justice of Quatman's criticisms of the office somehow violated the First Amendment.

appearance or clothing, and even derogatory references to their race or suspected sexual orientation—even though these remarks, like a juror's religion, would have been based on Quatman's observations and were never mentioned by the jurors themselves. It is also difficult to credit Freeman's assertion that "[b]ecause Judge Golde did not advise Mr. Quatman to exclude Jewish prospective jurors until *after* the *Hovey* voir dire, Mr. Quatman did not have any reason to determine, or make notes, whether potential jurors were Jewish *during* the *Hovey* voir dire." As Quatman explained in his declaration and in his conversation with Horowitz, he did not need advice from Judge Golde about excusing Jewish prospective jurors; this was something he said he already knew to do.

Quatman's claim that he downgraded Prospective Jurors Peisker and LaPut because of his ex parte conversation with Judge Golde about excluding Jews from the jury is further undermined by Freeman's failure to demonstrate that no other prospective juror's rating was downgraded. In fact, although the record does not include Quatman's notes for most of the prospective jurors, even this limited record reveals that Quatman downgraded Prospective Juror Dupree between his voir dire notes and the preparation of his Rolodex card for that juror. Inasmuch as Quatman never claimed that he believed Juror Dupree was Jewish, the record suggests that Quatman revisited his ratings of the venire once voir dire had been completed and he could evaluate each juror against the closed universe of possible jurors—not because of newfound suspicion as to their religion.

For all of these reasons, we find that Freeman has failed to discharge his burden to prove that Judge Golde advised Quatman to exclude Jewish prospective jurors on April 28, 1987, as alleged in the third petition for writ of habeas corpus.

B. *Whether Quatman Excused Jewish Prospective Jurors Based on Their Religion*

The petition can also be read to allege that even if the ex parte conversation did not occur, Quatman nonetheless excused prospective jurors because of their religion. We have previously stated that religious membership constitutes an identifiable group under *Wheeler.* (See, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122 [124 Cal.Rptr.2d 373, 52 P.3d 572].) The United States Supreme Court has not similarly extended *Batson*, although a number of state and federal courts have done so. (See *Miller-El v. Dretke* (2005) 545 U.S. 231, 270 [162 L.Ed.2d 196, 125 S.Ct. 2317, 2342] (conc. opn. of Breyer, J.).) Assuming without deciding that *Batson*, like *Wheeler*, applies to peremptory challenges based upon bias against religious groups,

we nevertheless adopt the referee's finding that Quatman did not exercise peremptory challenges against Prospective Jurors Mishell, Peisker, or LaPut because of their religion.

First, the record does not support Quatman's claim that he acted with a discriminatory motive.

As to Juror Mishell, Quatman testified that he rated her a zero at the "get-go" because, even before he allegedly considered her religion, he "didn't believe she was a good candidate to return death" and did not want her on the panel for any reason. As Quatman put it, "I wouldn't have kept Mrs. Mishell whether she was Jewish or not for any reason."

As to Jurors Peisker and LaPut, the fact that Quatman reduced their rating sometime between their voir dire and the big spin is inconsistent with Freeman's claim that Quatman acted in accordance with a "standard" or "institutional" practice of excluding Jews from capital juries. Had Quatman been acting under such a standard or institutional policy, he would have assigned Jurors Peisker and LaPut zero ratings at the outset.

Moreover, had Quatman been acting according to a standard or institutional policy of excluding Jews, then he surely would have noted these jurors' religion in his voir dire notes or the Rolodex cards he prepared for the big spin. After all, he had noted the race, the appearance, the clothes, and the possible sexual orientation of other jurors. His failure to note the religion (or his suspicions of their religion) in his voir dire notes or on his Rolodex cards of Jurors Peisker, LaPut, or Mishell further undermines Freeman's claim that Quatman exercised his peremptory challenges on an impermissible basis. Indeed, the fact that Quatman *did* write other identifying information on his Rolodex cards for these three jurors—for Peisker, that he was a member of the American Civil Liberties Union; for LaPut, that he was unemployed and never recovered from his father's death; and for Mishell, that she was "NO DP," meaning that she would not impose the death penalty—renders Quatman's assertion that he excused any of these jurors for a *different* and unremarked reason (i.e., their religion) unworthy of belief.

Second, the claim that Quatman exercised his peremptory challenges on an impermissible basis rests *entirely* on his credibility—which, as demonstrated above, was impeached at the evidentiary hearing. Not only did Freeman fail to establish that any of these prospective jurors were actually Jewish, he offered nothing other than Quatman's vague assertion that he *believed* these three prospective jurors were Jewish. In particular, Quatman offered no explanation as to why he would have believed Juror Peisker was Jewish (based on his name) yet would not have believed that the same was true of Juror Mosher—

who *did* serve as an alternate on the jury. Nor did Quatman explain why he would have concluded that Juror LaPut was Jewish, inasmuch as LaPut had testified in voir dire that he knew a deputy sheriff from working at the St. Vincent de Paul Society "in the church" *and* Quatman had written down and underlined "St. Vincent de Paul Society" and added "St. Bede's" in his voir dire notes for this juror. Thus, Quatman's contention that he excused Juror LaPut because he believed the juror was Jewish is not only itself incredible, but also casts doubt on the remainder of his testimony. Without good reason to believe Quatman's testimony, of course, Freeman's claim of error collapses.

Third, as demonstrated in the preceding section, Quatman had a motive to claim that he excused Jewish jurors from capital juries, and that he did so in accordance with "standard practice," in order to embarrass the Alameda County District Attorney's Office. Quatman's assertion that he selected a jury using unlawful criteria based on the policy of that office has garnered considerable attention in this state and nationwide. (See fn. 8, *post.*) The problem for Freeman, though, is that the record does not support the claim of bias in jury selection. In fact, the record refutes it.

According to the record, Quatman had determined that all three jurors were undesirable and had rated them unfavorably before he even *allegedly* considered their religion. Under Quatman's rating system, jurors rated below a six—which included Jurors Mishell, Peisker, and LaPut—were undesirable jurors, jurors Quatman intended to excuse if he had enough peremptory challenges remaining. In this case, Quatman had more than enough peremptory challenges remaining, since he used only 11 of his 36 challenges. Under these circumstances, we agree with the referee that Quatman never believed that any of these prospective jurors were Jewish, and, even if he did, that their religion was no part of his decision to excuse them.

## C. *The Fairness and Adequacy of the Reference Hearing*

The foregoing review of the record disposes of many of Freeman's exceptions and objections to the referee's findings and conduct of the hearing. A few of Freeman's objections, however, merit more extended discussion. He alleges that these errors deprived him of a full and fair opportunity to prove the allegations in the petition. After carefully reviewing the record, the proffered evidence, and the referee's rulings, we disagree.

"Foremost" among the errors, according to Freeman, was the referee's exclusion of evidence proffered to demonstrate that the district attorney's office had a standard practice of excluding Jewish prospective jurors in capital cases. But, as the record reveals, the referee admitted evidence of

office policy to the extent it was relevant to the questions this court had posed. Although the referee cautioned that "the purpose of this hearing, as defined by the Supreme Court, is not to conduct an examination of the practices of the Alameda County District Attorney's Office with respect to capital cases," the referee declared that "should the defense have evidence as it relates to the Freeman case, that Mr. Quatman's actions [were] in response to directions from supervisors from the Alameda County District Attorney's Office or should there be evidence . . . to establish that Mr. Quatman was told in all capital cases that he should exclude members of the Jewish community again by members of the Alameda County District Attorney's Office, that will be allowed." Thus, the referee allowed in evidence that Quatman said it was standard practice to exclude Jewish jurors in capital cases; that Quatman, as an experienced prosecutor, claimed he knew to exclude Jews from the jury and did not need instruction from Judge Golde; and that Quatman was a speaker at a California District Attorneys Association seminar in the early 1990's and advised the audience to exclude Jews from capital juries. Freeman was also permitted to explore whether former Assistant District Attorney James Anderson, who had been head of the capital trial team, had provided formal or informal training to deputies generally or to Quatman in particular concerning jury selection in capital cases. The referee did sustain relevance objections to questions designed to elicit Anderson's belief as to whether "it was common sense to exclude certain racial and religious groups based on . . . the belief that their politics would be adverse to the prosecution," but Anderson's uncommunicated beliefs were not relevant to either of the questions this court had posed to the referee.[7]

Freeman complains next that the referee improperly excluded evidence of Judge Golde's alleged pattern of engaging in ex parte communications with counsel. We disagree. Freeman presented Professor Thaman's accusations that then Deputy District Attorney Carol Corrigan engaged in an ex parte communication with Judge Golde in the *Day* prosecution concerning the dismissal of two prospective jurors for cause and that Thaman observed her in chambers with Judge Golde almost every morning before court was in session. Respondent in turn presented Justice Corrigan's testimony that no ex parte communication concerning jurors occurred; that the only ex parte

---

[7] Freeman also accuses the referee of precluding testimony from former Deputy District Attorney Alex Selvin, who reportedly would have testified that it was standard practice to exclude Jews from capital juries, that he expected this would have been discussed among attorneys in the capital unit, but that there was no formal policy in the office about this practice. Freeman, however, never called Selvin to testify. Moreover, because this testimony would have been cumulative of evidence already presented at the hearing, the referee would not have abused his discretion in excluding it. And, as we explained *ante*, had Quatman been acting according to a standard or institutional policy of excluding Jews, then he surely would have noted the jurors' religion in his voir dire notes or the Rolodex cards he prepared for the big spin.

contact she had with Judge Golde in the *Day* case was to advise him the People were taking a writ to review his ruling empanelling separate guilt phase and penalty phase juries; that she waited in the courtroom, not in chambers, for court to begin; and that she had been alone with Judge Golde in chambers on only two occasions, both of which involved social matters. After hearing the evidence, the referee rejected Professor Thaman's accusations and credited Justice Corrigan's testimony that no improper ex parte communications occurred in the *Day* case. The referee thus did not exclude the evidence; he merely disbelieved the evidence Freeman presented—a finding that we accept. There was nothing unfair in the referee's refusal, prior to making his finding, to judicially notice portions of the briefs filed in the *Day* automatic appeal that discussed the allegation of ex parte contacts. Those excerpts were hearsay.

Freeman also errs in alleging the referee precluded him from establishing that Judge Golde engaged in ex parte communications with attorneys concerning the exclusion of cognizable classes of jurors in other cases. At the outset of the reference hearing, the referee announced that "to the extent that the defense has evidence that would establish that Judge Golde engaged in ex parte communications with attorneys about jury selection, and that would include of course the use of peremptory challenges on other occasions, I would allow that. To the extent the defense has evidence that Judge Golde engaged in ex parte communications with prosecuting attorneys regarding capital cases, I will allow that." In accordance with that ruling, the referee allowed counsel to ask Anderson "whether he was privy to any sort of ex parte communication with Judge Golde where he advised attorneys ex parte about jury selection or advised prosecuting attorneys ex parte how to handle capital cases."

However, the referee did not permit counsel to inquire, apparently on the basis of a New York Times article,[8] whether Judge Golde had *at any time* advised him "in certain types of cases to be careful of African-Americans on the jury." Because the question went beyond the scope permitted by the referee, the record does not support Freeman's claim that the referee "abruptly changed course when Mr. Anderson took the stand." Nor was that

---

[8] The article in question reported Anderson as saying, " 'When I was a young D.A., [Judge Golde] would tell me, "If you have a cop case, be careful of blacks on the jury, because they don't like cops" ' . . . . 'I heard him tell defense lawyers: "Be careful of Asians. They are very law-and-order oriented." ' " (Murphy, *Case Stirs Fight on Jews, Juries and Executions*, N.Y. Times (Mar. 16, 2005) p. A1.) The article also reported that, according to Anderson, Judge Golde gave this advice "to prosecutors and defense lawyers about picking juries, but never during a trial and never about a particular juror." (*Ibid.*)

The record does not indicate whether these conversations predated *Wheeler* or *Batson*. We note, however, that Judge Golde was appointed to the bench in 1973 and that, at the time of the reference hearing, Anderson had retired after 35 years in the district attorney's office.

question designed to prove that Judge Golde had a habit or custom of offering ex parte advice about jury selection.

Even if the referee had erred in limiting counsel's cross-examination of Anderson about the New York Times article, it would not affect our finding that Freeman failed to prove that Judge Golde colluded with Quatman in this case to secure a conviction and death judgment. At most, it would have lent support to Horowitz's testimony of what Quatman told him about the meeting with Judge Golde—i.e., that Quatman was "just kind of 'kicking it' with the judge and just talking about cases in general terms." In other words, the New York Times article, combined with other evidence in the record, would have supported the portrait of Judge Golde as someone who dispensed advice freely to prosecutors and defense attorneys alike. Quatman, a career prosecutor, testified that he sought Judge Golde's advice "on many different items, both professional and personal." Horowitz, a defense attorney, testified that "Judge Golde was my advisor. He was probably that to many people, not just me." And, according to Anderson's statement in the New York Times article, Judge Golde gave general advice about picking juries to both prosecutors and defense attorneys, "but never during a trial and never about a particular juror."

If Judge Golde did at some earlier point advise prosecutors and defense counsel, as recounted in the New York Times article, to "be careful of" prospective jurors from certain racial groups because of attitudes believed to be prevalent in the group (see fn. 8, *ante*), that advice was improper. (See Cal. Stds. Jud. Admin., § 1, subd. (a)(2) [court's duty to prohibit conduct exhibiting group bias in judicial proceedings].) But the question before us is not whether Judge Golde may have ever given improper advice to attorneys about jury selection, but whether Judge Golde colluded with the prosecutor in this case to secure a judgment favorable to the prosecution. For the reasons stated, we have found that he did not. Conversations that Judge Golde had with other attorneys, assuming they occurred, would not have supported Freeman's allegation that Judge Golde was biased against him or that he treated Quatman preferentially.[9]

---

[9] The same is true of evidence in the record that Judge Golde conducted a very informal chambers. Quatman testified that Judge Golde's chambers "were like a bazaar, only there were people in there, some drinking coffee, some reading the papers, some doing business talking about cases. . . . It was kind of the meeting place of superior court." Horowitz testified that in "the old days," it was common "for judges to have their doors opened, and counsel, individually[,] in groups, or coming and going, can sit there and talk to the judges as just normal people." Freeman also proffered a declaration from former Deputy Public Defender Lawrence Boxer, which stated that Judge Golde's chambers were like a "souk in Algiers," with "bargaining out loud among counsel and the Judge, deals being made, name-calling, agreements reached, sentences agreed to; a rich, if, to the uninitiated, somewhat shocking atmosphere." Because of the potential for confusion and mischief, we reiterate that trial courts in

Next, Freeman complains that the referee excluded evidence of other ultra vires conduct by Judge Golde, ranging from evidence that Judge Golde once had an ex parte conversation with a juror in a capital case to judicial notice of instances in which the Court of Appeal had admonished Judge Golde concerning improper jury instructions. We agree with the referee that evidence of misconduct or of substandard conduct by Judge Golde in other circumstances was of little relevance to the truth of the allegations in Freeman's petition and therefore find no abuse of discretion in the referee's rulings.

Finally, Freeman complains that the Attorney General, who represented respondent in this proceeding, acted under a conflict of interest and sought to suppress evidence favorable to Freeman and to intimidate one of Freeman's witnesses. As to the alleged conflict of interest, we note that counsel moved prior to the reference hearing to recuse the Alameda County District Attorney's Office from representing respondent and that the referee granted the motion. The Attorney General thereafter represented respondent, with investigative assistance from the district attorney's office. Because Freeman did not object to this arrangement at the reference hearing, he cannot be heard to challenge it now. (*People v. Catlin* (2001) 26 Cal.4th 81, 162 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Moreover, there was no error in allowing investigators from the district attorney's office to continue their work under the supervision of the Attorney General. (*People v. Clark* (1993) 5 Cal.4th 950, 999–1000 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

As to the claim that the Attorney General sought to suppress evidence favorable to Freeman and to intimidate one of his witnesses, we find the record is equivocal. Freeman's counsel stated at the reference hearing that respondent flew Attorney David Stufft down from Montana but, after interviewing Stufft, decided not to use him. According to counsel, a member of "the prosecution team" then approached Stufft when he appeared in court the day he testified for the defense and informed him "they would not pay for his return flight to Montana." The Attorney General responded that he knew nothing about such a threat. Moreover, as counsel conceded, respondent had already purchased Stufft a round-trip ticket and, as the Attorney General pointed out, was obligated by statute to pay for the return flight under the Uniform Act to Secure the Attendance of Witnesses from without the State of California. (See Pen. Code, § 1334 et seq.) Assuming nonetheless that Stufft was threatened with nonpayment of his return airfare if he testified on Freeman's behalf, we agree with Freeman that the referee erred in excluding evidence of the threat as irrelevant. "Evidence that a witness . . . fears retaliation for testifying is relevant to the credibility of that witness and is

capital cases should meticulously comply with Penal Code section 190.9 and place all proceedings on the record. (See *People v. Freeman, supra,* 8 Cal.4th at p. 511.)

therefore admissible." (*People v. Burgener* (2003) 29 Cal.4th 833, 869 [129 Cal.Rptr.2d 747, 62 P.3d 1].) This minor fact, if it be one, does not affect our finding that Quatman's character for honesty and integrity was poor, however. Nor does it demonstrate that Freeman was denied a full and fair hearing, inasmuch as Stufft did appear and testify on Freeman's behalf.

### D. *Freeman's Motion to Take Additional Evidence*

Three months after the referee filed his report, counsel filed a motion asking us to take additional evidence in the form of depositions of Gary Sirbu, a criminal defense attorney; Tom Orloff, the Alameda County District Attorney; and Professor Philip Stark, who had prepared a study of peremptory challenges in capital cases in Alameda County. As to Sirbu, counsel alleged that he had recently learned from Lawrence Boxer that Sirbu walked in on Judge Golde having ex parte conversations about the admissibility of postmortem photographs with the prosecutor in a different murder case. Sirbu declined to execute a declaration "because he said his conversation with Mr. Boxer was intended to be a private matter" but "represented that if subpoenaed as a witness in an appropriate proceeding, he would have no alternative but to testify truthfully to the foregoing information." As to Orloff, counsel alleged that he had recently discovered that Orloff made a financial contribution to Quatman's judicial campaign in 1996. Finally, counsel alleged that Professor Stark had undertaken an analysis of all capital cases tried in Alameda County between 1977 and 1987 and had determined that there was a less than 0.16 percent chance that the prosecutorial strikes against Jewish jurors had resulted from random factors other than their religion. Counsel had made the same proffer at the reference hearing, but the referee had rejected it as beyond the scope of the issues framed by this court.

■ Because the factfinding process has not yet concluded, we do not doubt that we have discretion to take additional evidence. However, we have not yet considered what standard we should apply to such a request. It would seem that this situation is at least somewhat analogous to a trial court's discretion to permit a party to reopen its case to present additional evidence. In determining whether a trial court has abused its discretion in denying a defense request to reopen its case to present additional evidence, we have directed reviewing courts to consider "the following factors: '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.' " (*People v. Jones* (2003) 30 Cal.4th 1084, 1110 [135 Cal.Rptr.2d 370, 70 P.3d 359], quoting *People v. Funes* (1994) 23 Cal.App.4th 1506, 1520 [28 Cal.Rptr.2d 758].) Although the third of these factors is essentially irrelevant when a referee, not a jury, is involved, we

deem the remaining factors useful as a guide in exercising our discretion. Even if we were to assume that Freeman acted diligently in uncovering this evidence, we find that he has failed to establish a convincing showing under the first and fourth factors.

As stated, counsel submitted his request to take additional evidence three months after the referee filed his report. By that point, both sides had prepared and filed their briefs on the merits, totaling 95 pages, and Freeman had in addition prepared and filed exceptions to the referee's findings in a 56-page brief. Freeman offers no special justification for suspending a matter that was mostly briefed, nor does he claim that the evidence is of such importance as to justify requiring the parties to rebrief the matter following the receipt of this new evidence.

Indeed, the evidence sought to be produced, even as alleged, is "far from critical." (*People v. Funes, supra*, 23 Cal.App.4th at p. 1521.) Assuming Sirbu were to testify that Judge Golde had an ex parte conversation in a murder case with a prosecutor concerning the admissibility of postmortem photographs, it would not affect our conclusion that Judge Golde did not advise Quatman to exclude Jewish prospective jurors prior to the big spin in this prosecution. Evidence that Orloff contributed an unknown sum to Quatman's judicial campaign would not undermine our conclusion that Quatman harbored a long-standing grudge against Orloff and the district attorney's office, nor (inasmuch as Orloff did not opine on Quatman's character) would it alter our assessment of Quatman's character for honesty and integrity. And Professor Stark's study, which purports to demonstrate that the district attorney's office had a practice of exercising peremptory challenges against Jewish prospective jurors, would have little relevance to Quatman's conduct here, inasmuch as Freeman has failed to establish that any of the jurors in question were Jewish or that Quatman excused them because he believed they were. Even if the study were offered merely to show that the office had a policy of excluding Jewish prospective jurors, it would not alter our conclusion in the preceding section, based on the available documentary evidence, that Quatman did not excuse any jurors in this case because of their religion.[10] We therefore deny Freeman's motion to take additional evidence.

## CONCLUSION

Freeman leveled very serious allegations about Judge Golde and the conduct of his trial but, after a full and fair evidentiary hearing, he failed to

---

[10] For the same reasons, we find no error in the referee's exclusion of the study at the reference hearing.

prove they were true. Because our order to show cause and subsequent reference hearing were limited to the claims of judicial collusion with the prosecution to secure a conviction and death judgment and the prosecution's discriminatory exercise of peremptory challenges, we do not discuss the other claims presented in the petition. As is our usual practice, we will resolve the petition for writ of habeas corpus by a separate order. (*In re Thomas, supra,* 37 Cal.4th at p. 1277.) The order to show cause is discharged.

George, C. J., Kennard, J., Werdegar, J., Moreno, J., Boland, J.,[*] and Haller, J.,[†] concurred.

Petitioner's petition for a rehearing was denied July 12, 2006. Chin, J., and Corrigan, J., did not participate therein.

---

[*]Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[†]Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.