Filed 6/24/14  P. v. Thomas CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL FRANCIS THOMAS,<br><br>    Defendant and Appellant. | 2d Crim. No. B249937<br>(Super. Ct. No. 1422488)<br>(Santa Barbara County) |

Michael Francis Thomas appeals from the judgment entered after a jury convicted him of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and threatening to use force or violence upon the victim of a crime.  (*Id*., § 140, subd. (a).)  Appellant represented himself during the trial.  He was sentenced to prison for three years.

Appellant contends that the trial court (1) erroneously admitted evidence of prior uncharged offenses to show motive or common plan, (2) erroneously excluded evidence of specific instances of the victim's dishonesty, and (3) engaged in judicial misconduct.  We affirm.

*Facts*

*People's Evidence*

Jahawn Nazari and appellant resided on property owned by Lillian Stewart. Appellant managed the property and was living in the house. Nazari was living in a shed and paid appellant rent of $200 per month.

On August 14, 2012, Nazari and appellant argued about a computer. After the argument, Nazari went inside the shed. Half an hour later, appellant kicked open the door to the shed. He had a shovel in his hand that he swung at Nazari, who was "in fear for [his] life." Appellant "just kept swinging and swinging." "[H]is face was pure red."

Nazari tried to use his laptop computer as a shield to protect himself. Appellant hit the laptop with the shovel and "smashed" it. He hit Nazari's body six or seven times. Appellant said, " 'Who's Mr. Tough Guy now?' "

Appellant stopped swinging the shovel and showed Nazari a 30-day eviction notice. Appellant said, " 'I was planning on kicking you out, but I'm not going to do it.' " Nazari stated that he "was going to call the cops." Appellant replied: " 'Oh, you want to be a cop caller. You need to get off this property. If you don't leave, I'm going to smash your car windows out.' "

Appellant walked out of the shed and telephoned the police. Sergeant Lorenzo Duarte arrived at the property in response to the telephone call. He saw bruising on Nazari's right shin and left shoulder. After appellant was arrested, he said to Nazari, " 'Just wait until I get out, fuck-head. You think it was bad this time, just wait till I get out.' "

*Appellant's Evidence*

Appellant testified as follows: He was "very angry" at Nazari and "started running toward him." Nazari ran into the shed. Appellant went to the doorway of the shed and yelled at Nazari, who "was cowering in the corner" while holding his laptop over his head. Appellant did not threaten him or swing a shovel at him. "There wasn't even a shovel around."

Appellant admitted yelling at Nazari: " 'Just wait until I get out, fuck-head.  You think it was bad this time, just wait until I get out.' "  By this statement, appellant meant that when he got out of jail, Nazari "was going to be evicted.  He was going to get a 30-day notice."

Robert Brinton, appellant's friend, testified that a person could not swing a shovel inside the shed without hitting shelving, rafters, or exposed wiring.

*Uncharged Offenses Committed Against Zamorano*

Emilio Zamorano was living with Stewart on her property.  On February 19, 2011, Zamorano and appellant "had a confrontation . . . because [Zamorano] had parked his [truck] to the rear of the parking lot next to the garage [on Stewart's property] where [appellant] was staying."  Appellant ordered Zamorano to leave the premises.  When Zamorano did not leave, appellant said that "if he didn't leave [appellant] was going to break the windows of his truck."  Appellant used a crowbar to smash one of the truck's windows.  In an expression of "frustration with Mr. Zamorano's presence on the property," appellant cut an electrical communication cable that Zamorano had been using.

Later that same day, appellant said to Zamorano, " 'You better get out of here and get all your trash out of here too.' "  Appellant punched Zamorano's truck.  Zamorano drove away, and appellant chased the truck while holding a large stick.  He "hit the back of the truck with [the stick] as it was going out of the driveway."  Appellant repeatedly said, " 'I am the landlord and the king of this property.' "

*Uncharged Offense Committed Against Chauff*

In May 2011 Gerald McCullough was living in a house on Stewart's property.  Charles Chauff came to the property to visit McCullough.  McCullough had warned Chauff not to visit him because appellant had threatened that "if [Chauff] comes over here I am just going to kick his ass."

Appellant and Chauff got into an argument.  Appellant chased Chauff while holding a stick that was attached to a three-pronged "garden tool."  Appellant said to Chauff, " 'You better get out of here or I'll kill you.' "  Chauff put his "arm up in defense and the stick broke right over his arm."  Appellant hit Chauff at least six or seven times

with the broken stick.  Chauff sought treatment at a hospital.  The parties stipulated that "Chauff's arm was bruised but not broken."  The court took judicial notice of appellant's misdemeanor conviction for assaulting Chauff with a deadly weapon.

*Admissibility of Zamorano and Chauff Uncharged Offenses*

The People sought to admit the Zamorano and Chauff uncharged offenses to show motive, intent, and common plan.  The court instructed the jury that it could consider these uncharged offenses for the limited purpose of determining whether appellant had a motive or plan to commit assault with a deadly weapon.  Appellant maintains that the uncharged offenses were erroneously admitted.

"As a general rule, evidence of uncharged crimes is inadmissible to prove the defendant had the propensity or disposition to commit the charged crime.  ([Evid. Code,] § 1101, subd. (a);[1] [citations].) . . .  [¶]  Evidence of other crimes is admissible, however, when relevant for a non-character purpose—that is, when it is relevant to prove some fact other than the defendant's criminal disposition, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake of fact or accident.' (§ 1101, subd. (b); [citations].)" (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.)

The standard of review is abuse of discretion.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1328.)  " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]'  [Citation.]" (*Id*., at pp. 1328-1329.)

" 'Evidence of uncharged crimes is admissible to prove . . . common design or plan, . . . only if the charged and uncharged crimes are sufficiently similar to support a rational inference of . . . common design or plan . . . . [Citation.]' [Citation.]" (*People v. Foster*, *supra*, 50 Cal.4th at p. 1328.)  "[E]vidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of

---

[1] Unless otherwise stated, all further statutory references are to the Evidence Code.

4

which they are individual manifestations.' [Citation.]" (***Ibid***.) " '[A] common scheme or plan focuses on the manner in which the prior misconduct and the current crimes were committed, i.e., whether the defendant committed similar distinctive acts of misconduct against similar victims under similar circumstances.' [Citation.]" (*People v. Walker* (2006) 139 Cal.App.4th 782, 803.)

"Other crimes evidence is admissible to establish two different types or categories of motive evidence. In the first category, 'the uncharged act supplies the motive for the charged crime; the uncharged act is cause, the charged crime is effect.' [Citation.] 'In the second category, the uncharged act evidences the existence of a motive, but the act does not supply the motive. . . . [T]he motive is the cause, and both the charged and uncharged acts are effects. *Both crimes are explainable as a result of the same motive.*' [Citation.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381.)

We need not determine whether the uncharged offenses were admissible to show motive. The trial court did not abuse its discretion in ruling that they were admissible to show a common plan. Evidence of the charged and uncharged offenses demonstrates " ' "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations." ' [Citation.]" (*People v. Foster*, *supra*, 50 Cal.4th at p. 1328.)

Appellant " 'committed similar distinctive acts of misconduct against similar victims under similar circumstances.' [Citation.]" (*People v. Walker*, *supra*, 139 Cal.App.4th at p. 803.) All of the incidents occurred on Stewart's property. Appellant wanted the victims to leave the property. After arguing with them, appellant made similar threats and engaged in similar acts of violence. He told Zamorano that "if he didn't leave [appellant] was going to break the windows of his truck." Appellant used a crowbar to smash one of the truck's windows. He later chased the truck with a large stick and "hit the back of the truck with [the stick] as it was going out of the driveway." Appellant threatened Chauff by saying, " 'You better get out of here or I'll kill you.' " He assaulted Chauff with a stick that was attached to a three-pronged "garden tool."

Appellant went to Nazari's shed with an eviction notice and assaulted him with a shovel. When Nazari said he was going to call the police, appellant threatened, " 'If you don't leave, I'm going to smash your car windows out.' "  Thus, the charged and uncharged offenses manifest a common plan to threaten and commit acts of violence against persons whom appellant wanted removed from Stewart's property.

If evidence of prior uncharged offenses is admissible, "the trial court then must consider whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid.Code, § 352.)' [Citation.]" (*People v. Foster*, *supra*, 50 Cal.4th at p. 1328.)  "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. . . . 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)  Rulings made under section 352 are reviewed for an abuse of discretion. (*People v. Foster*, *supra*, 50 Cal.4th at p. 1328.)

The trial court did not abuse its discretion.  The uncharged offenses were highly probative evidence.  "There was not a substantial danger of undue prejudice because the circumstances of the [prior] incident[s] were no more inflammatory than the circumstances of the current incident involving [Nazari].  [Citation.]" (*People v. Callahan* (1999) 74 Cal.App.4th 356, 371.)  The uncharged offenses were not remote in time: they occurred within 18 months of the charged offense.  "[T]he prejudicial effect of [the uncharged offense against Chauff] is [lessened] by the circumstance that [appellant's] uncharged act[] [resulted] in [a] criminal conviction[].  This circumstance [decreased] the danger that the jury might have been inclined to punish [appellant] for the uncharged offense[] . . . ." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)  Furthermore, "the trial court's instructions to the jury under [CALCRIM No. 375] regarding evidence admitted for a limited purpose, and . . . advising it to consider such evidence not to prove

6

[appellant's bad character or] predisposition to commit crimes but rather to determine whether [appellant had a motive or plan to commit assault with a deadly weapon], eliminated any danger 'of confusing the issues, or of misleading the jury.' (Evid.Code, § 352.) We presume the jury followed these instructions. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 25-26.)

*Exclusion of Evidence of Specific Instances of Nazari's Dishonesty*

A witness's credibility may be attacked by specific instances of dishonesty. (*In re Freeman* (2006) 38 Cal.4th 630, 640, fn. 5.) Appellant contends that the trial court erroneously excluded Robert Brinton's proposed testimony that Nazari had lied on prior occasions.

Brinton's proposed testimony was set forth at a section 402 hearing out of the jury's presence. At the hearing Brinton testified as follows: For about four years, Brinton and Nazari worked for the same telemarketing company, Frontier. "Several times" they worked "side by side." During telephone conversations with customers, Nazari told them that if the program he was selling "does not work for you, then it[']s a hundred percent guaranteed [that] you will get all your money back." This was "not the truth." The prosecutor asked Brinton, "Was there any type of refund period where customers could get their money back?" Brinton responded, "Well, with FTC, I believe it's 24 hours." The prosecutor continued, "So it was true that they could get their money back?" Brinton replied, "If they pressed the right buttons, anyone could get their money back."

The trial court ruled that Brinton's proposed testimony was inadmissible for "insufficient foundation on the issue . . . regarding honesty, veracity." It also ruled that, pursuant to section 352, "the probative value of the testimony on this issue is substantially outweighed by the probability that admission would create a substantial danger of undue prejudice and confuse the issues." We review the trial court's rulings for abuse of discretion. (*People v. Foster*, *supra*, 50 Cal.4th at p. 1328; *People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

The trial court did not abuse its discretion. The court could have reasonably determined that Brinton's proposed testimony had little, if any, probative value and would

7

confuse the issues because he did not know Frontier's refund policy. When the prosecutor asked Brinton about its refund policy, he did not say what that policy was. Instead, he said what he "believed" to be the FTC's (Federal Trade Commission's) policy. No evidence was presented as to the FTC's actual policy. Furthermore, Brinton acknowledged that "[i]f they pressed the right buttons, anyone could get their money back." Accordingly, Brinton's proposed testimony was insufficient to show that Nazari had lied when he told customers that they could get their money back. We reject appellant's contention that the exclusion of Brinton's testimony violated his Fifth Amendment right to a fair trial and his Sixth Amendment right to present a defense.

*Judicial Misconduct*

During his cross-examination of Nazari, appellant stated to the court, "Your honor, I would request that you admonish Mr. Nazari to answer these questions truthfully and fully to his best ability." The court replied: "All right. Mr. Thomas, I have no reason to believe that isn't occurring. So ask your next question, please." Appellant did not object to the court's reply. He argues that the reply "amounted to an improper instruction to the jury regarding how Nazari's credibility should be assessed." "By stating that it had 'no reason to believe' that Nazari wasn't being truthful, the court was . . . giving an implied endorsement as to the truthfulness [of his testimony]."

The court's reply was not a jury instruction. It was an expression of the judge's personal opinion that was directed at appellant, not the jury. Appellant is in effect claiming that the reply constituted judicial misconduct. "As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial. [Citations.] However, a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when objecting would be futile. [Citations.]" (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.) Here, there is no reason to believe that an objection and request for an admonition would have been futile or would not have cured any resulting prejudice. Consequently, appellant forfeited the judicial misconduct issue.

8

In any event, the judge's brief reply was innocuous and did not constitute misconduct. It was a reasonable response to appellant's inappropriate implied assertion that Nazeri was lying.

*Disposition*

The judgment is affirmed.

NOT TO BE PUBLISHED.


                                        YEGAN, J.

We concur:



GILBERT, P.J.



PERREN, J.

9

Jean Dandona, Judge

Superior Court County of Santa Barbara

_____

John Derrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. , Supervising Deputy Attorney General, Connie H. Kan, Deputy Attorney General, for Plaintiff and Respondent.